John L. DONOHUE, Walter D. Jones, Benjamin F. Scheib, Joseph R. Smola, Anthony M. DiIanni, and Audrey C. Hunter, Individuals, Plaintiffs,

v.

CUSTOM MANAGEMENT CORPORATION and Custom Restaurant Corporation, corporations; John Metz and Robert Madigan, Individuals, Defendants.

Civ. A. No. 84–497.

United States District Court, W.D. Pennsylvania.

April 25, 1986.

Jane A. Lewis, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiffs.

Kevin Lucas, Manion, McDonough & Lucas, Pittsburgh, Pa., for defendants.

## MEMORANDUM AND ORDER

SIMMONS, District Judge.

### I. *Introduction*

This action involves claims asserted by six individuals who were hired by Defendant Custom Restaurant Corporation ("CRC") in late 1981 and 1982 in connection with CRC's acquisition of certain delicatessens and restaurants from The Isaly Company ("Isaly"). Plaintiffs' employment was terminated on January 11, 1983, when the mounting economic losses incurred by CRC led to the elimination of their jobs and an assumption of their job duties by existing employees of Custom Management Corporation ("CMC"), the parent corporation of CRC. The staggering losses continued notwithstanding this cost-saving measure, and CMC was forced to abandon the restaurant business altogether by closing or selling all the delicatessens and restaurants and, in March 1985, selling all of the stock of CRC itself.

In their Complaint, Plaintiffs allege that the financially-compelled elimination of their jobs constituted violations of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA") (Count I), and the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA") (Count II), and also constituted a breach of an implied contract for "continued employment" with CRC (Count III). In addition to CMC and CRC, Plaintiffs have named as Defendants John Metz, the president of CMC, and Robert Madigan, a former acting president of CRC. Defendants now move for Summary Judgment on all counts.

### II. *Facts*

CMC was founded in 1967, under the name of Customer Food Management Services, by Defendant John C. Metz. CMC is a contract management company which concentrates on providing institutional food and environmental (laundry, housekeeping, maintenance, grounds-keeping and security) services to health care establishments, schools and businesses. Prior to 1981, CMC maintains that it had never participated in the operation of public restaurant establishments as the business of CMC was centered on the management of institutional food and environmental service departments.

CRC was founded in 1981, as a wholly-owned subsidiary of CMC. Effective Octo-

ber 18, 1981, CRC acquired 26 Isaly delicatessens and 2 Sweet William restaurants from Isaly, which was then a subsidiary of the Clabir Corporation. Later, in May 1982, CRC acquired an additional 16 Sweet William restaurants from Isaly. CMC maintains that subsequent to its aquisition of the delicatessens and restaurants in October 1981, it intended to operate CRC as an independent corporation from its parent, CMC. Thus CMC established a completely separate management, accounting, and operational workforce for CRC.

Five of the six Plaintiffs, including Donohue, Scheib, Smola, DiIanni and Hunter, were hired by CRC on October 19, 1981, in connection with the initial restaurant acquisition. The sixth Plaintiff, Jones, was hired by CRC in May 1982, at the time of the second restaurant acquisition. All of the Plaintiffs had been employees of Isaly and were hired by CRC to assist in the management and operation of the newly-acquired restaurants. It is undisputed by Plaintiffs that at the time Isaly sold the delicatessens and restaurants to CRC, their jobs with Isaly had been eliminated and they had not been offered alternate employment with either Isaly or its parent corporation. It is also undisputed that CRC had no obligation whatsoever to hire Plaintiffs.

Unfortunately, during the first 6–8 months of its existence, CRC lost vast amounts of money in connection with the operation of the Isaly and Sweet William establishments. In the fiscal year ending June 30, 1982, CRC sustained a loss of $415,587, before payment of income taxes and intercompany management fees. By August 1982, CRC had lost nearly $700,000, a staggering amount given the fact that the restaurants acquired in 1981, had been purchased for their $1.7 million book value and a $887,000 note guaranteed by CMC. Defendants maintain that these mounting losses had escalated to a level at which they threatened the economic existence of both CRC and CMC.

By January 1983, the losses sustained by CRC continued to grow, and the CRC operation showed no signs of a "turn-around" toward profitability. Therefore, a decision was made to eliminate all CRC line management positions and to transfer the CRC management functions to CMC management employees in an effort to eliminate some of the losses associated with CRC operation. All of the line management positions in CRC above the unit manager level were eliminated and the personnel holding those positions were terminated. This included the Director of Operations position held by Plaintiff Jack Donohue; the Senior District Manager position held by Plaintiff Walter Jones; and the District Manager positions held by Plaintiffs Benjamin Scheib, Joseph Smola, and Anthony DiIanni.

Thus, on January 11, 1983, Plaintiffs were informed that their jobs were being eliminated, and that effective that date their employment with CRC was terminated. After January 11, 1983, the duties previously performed by these Plaintiffs were assumed and spread among at least nine (9) different CMC management employees, all of whom had been employed by CMC long before the October 1981 Isaly Acquisition. Of those assuming the CRC duties, four (4) were 40 years of age or older, and all had substantial experience in CMC's primary business of industrial food and environmental management.

### III. *Discussion*

#### A. *Age Discrimination Employment Act Claim*

In deciding Defendants' Motion for Summary Judgment, the Court must resolve any doubts as to the existence of genuine issues of fact against the moving party and must view all reasonable inferences in the light most favorable to the party opposing the motion. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Hollinger v. Wagner Mining Equipment Co.*, 667 F.2d 402, 405 (3d Cir. 1981); *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981); *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *Cert. Denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Although the Third

Circuit has emphasized that summary judgment is a drastic remedy, *see Hollinger,* 667 F.2d at 405, courts must grant the motion where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ P. 56(c). The establishment of a *prima facie* case of age discrimination does not necessarily defeat a motion for summary judgment. *Doby v. Jones & Laughlin Steel, Inc.,* 624 F.Supp. 874 (W.D.Pa.) (Simmons, J.); *Graham v. F.B. Leopold Company, Inc.,* 602 F.Supp. 1423 (W.D.Pa.1985); *Pierce v. New Process Co.,* 580 F.Supp. 1543 (W.D.Pa.), *aff'd Mem.,* 749 F.2d 27 (3d Cir.1984); *Keller v. Bluemle,* 571 F.Supp. 364 (E.D.Pa.1983), *aff'd without opinion,* 735 F.2d 1349 (3d Cir.1984); *Fick v. Canterbury Coal Co.,* 568 F.Supp. 927 (W.D.Pa.1983).

The Defendants' burden in seeking summary judgment must be considered in light of the intermediate and ultimate burdens of proof provided for under the ADEA. The Act bars employers from discharging or otherwise discriminating against any individual, age forty to seventy, because of his age, but provides that it is not unlawful to discharge or otherwise discipline an individual for good cause. 29 U.S.C. §§ 623(a)(1), 623(f)(3).

 Because of the similarity in language and purpose between the ADEA and Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* employees (or former employees, as in the present action) alleging age discrimination are generally held to the same requirements for burden and allocation of proof as those alleging race or sex discrimination. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Massarsky v. General Motors Corp.,* 706 F.2d 111 (3d Cir.); *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983); *Smithers v. Bailar,* 629 F.2d 892 (3d Cir.1980). Therefore, in accordance with *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 688 (1973), the order of proof in this ADEA case requires that Plaintiffs establish a pri-

ma facie case of age discrimination by proving that: 1) he is within the protected age group of 40–70 years; 2) he was subject to adverse employment action; 3) he was qualified for the positions in question; and 4) younger employees were treated more favorably. Proof of these facts raises a rebuttable presumption of discrimination which Defendants may counter by presenting a legitimate, non-discriminatory reason for the employment action. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. *Accord Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393 (3d Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984); *Bower v. State Equipment Division,* 31 BNA FEP cases 825 (W.D.Pa.1983).

 In cases (such as the instant action) involving reductions-in-force as opposed to individual discharges, courts have modified the *Burdine/McDonnell Douglas* analysis to address the fact that in most cases, a laid-off employee is not necessarily replaced, but rather his duties are either subsumed in the job responsibilities of other employees or are not performed at all. In these instances, the courts have generally required the Plaintiff, in order to establish a *prima facie* case, to show that he is in the protected age group and was laid off while younger employees working in similar jobs were retained. *See, e.g., Duffy v. Wheeling-Pittsburgh Steel Corp.,* 738 F.2d at 1395 n. 3; *Douglas v. Anderson,* 656 F.2d 528 (9th Cir.1981).

 In the present case, it is undisputed that Plaintiffs were members of the protected class and were subjected to adverse action. While there is some dispute about Plaintiffs' qualifications for the positions at issue, for purposes of this Motion, this Court concludes that Plaintiffs have adduced sufficient evidence to permit a trier of fact to determine if, in fact, Plaintiffs were qualified. However, Plaintiffs have not established a *prima facie* case of age discrimination because they have clearly failed to establish that "younger employees were treated more favorably", *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094, *Massar-*

*sky,* 706 F.2d at 118; *Duffy,* 738 F.2d at 1395, either through proffering evidence "that their position was ultimately filled by someone younger than [them]," *Bower,* 31 FEP cases at 826, or that they were discharged while younger employees working in *similar* jobs were retained. Plaintiffs need not prove that age was the employees sole or exclusive consideration "but *must* prove that age made a difference in the decision to terminate Plaintiffs". *Duffy,* 738 F.2d at 1395, quoting, *Smithers v. Blair,* 629 F.2d at 898. (emphasis added) Accord, *Doby, supra.*

Contrary to Plaintiffs' position (*see* Plaintiff's Mem. at 5–6), it is settled law under the ADEA that a Plaintiff seeking to establish a *prima facie* case must satisfy the four elements set forth in *Burdine. Duffy, supra; Massarsky, supra; Smithers, supra; Doby, Supra; Bower, Supra.* The fourth element in particular is unquestionably necessary because it is the fourth element alone that gives rise to the inference that the employer has "dealt discriminatorily with otherwise similarly situated employees" based on age. *Grecco v. Spang & Co.,* 527 F.Supp. 978, 980 (W.D.Pa.1981).[1]

■ In the instant action, Plaintiffs have failed to satisfy the fourth requirement for a *prima facie* case of age discrimination because the evidence is undisputed that *all* of the CRC line management positions which they held were eliminated in connection with the termination of their employment on January 11, 1983. In other words, CRC did not retain *any* employees—younger or older than Plaintiffs—in the job positions previously held by them. Instead, the management duties of these eliminated job positions were allocated as additional job responsibilities among at least nine different Custom Management Corporation ("CMC") employees, all of whom had been employed by CMC before Plaintiffs even

began their employment with CRC in October 1981.[2] These CMC employees cannot be considered to be "similarly situated" to Plaintiffs because their primary job responsibilities, both before and after the termination of Plaintiffs' employment, lay in CMC's institutional contract management business, a field in which none of the Plaintiffs had any experience. Thus, Defendants did not accord more favorable treatment to any similarly situated younger employee.

■ Even if, *in arguendo,* Plaintiffs could establish a *prima facie* case of age discrimination, the Defendants could dispel the adverse inference by articulating "some legitimate, non-discriminatory reason" for the employment decision or action. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Massarsky v. Gm,* 706 F.2d at 118. *Smithers,* 629 F.2d at 895. The test for this intermediate burden of production is whether the employer sets forth admissible evidence permitting the trier of fact rationally to conclude that the employment decision was not motivated by discrimination. *Burdine,* 450 U.S. at 257, 101 S.Ct. at 1095.

■ This Court finds that Defendant-Employer has presented undisputed, clear, legitimate, non-discriminatory reasons for the termination of Plaintiffs. It is undisputed that CRC was operating at a substantial loss. As CMC president John Metz testified, "We just could not make it any longer. It was a matter of going out of business or closing the office." (Metz Depo. at 96).

Because of the staggering losses incurred by CRC which threatened the economic viability of both CMC and CRC, the decision was made to cut some of the CRC losses by eliminating management positions and reducing some of the overhead associated with the CRC operation. Once the decision was made, *all* the line manage-

1. Plaintiffs' argument that a prima facie case under the ADEA requires only a tri-partite showing is particularly inexplicable inasmuch as all of the cases cited by Plaintiffs in their own discussion of the ADEA, (See Plaintiffs' Mem. at 5–15), require that *all four elements* be satisfied to establish a prima facie case of age discrimination.

2. Four of the CMC employees identified by Defendants were also in the protected age group of 40–70 years.

ment positions in CRC were eliminated, including Plaintiffs' positions.

Defendants have unquivocally rebutted any presumption of discrimination and Plaintiffs would therefore be required (if they could establish a *prima facie* case) to show that Defendants' reason for the termination is a pretext, or that evidence exists proving Defendants' discriminatory intent. *Graham v. F.B. Leopold Co., Inc.,* 602 F.Supp. at 1425; *McClain v. Mack Trucks, Inc.,* 532 F.Supp. 486, 489 (E.D.Pa. 1982). *See also Nicholson v. Western Electric Co.,* 555 F.Supp. 3, 8 (M.D.N.C. 1982), *aff'd without op.,* 701 F.2d 167 (4th Cir.1983). ("The Defendant has met its burden of articulation. In order for the Plaintiff to survive a motion for summary judgment, he must produce some evidence which would support his claim that Defendants' stated reasons are pretexts and *that the actual intent of the Defendant is to discriminate against him because of his age, race or sex* "). (Emphasis in original)

■ Plaintiffs' intermediate burden to prove pretext merges with their ultimate burden to persuade the court "but for" the employer's unlawful discrimination, they would not have been discharged. *See Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095, *Keller v. Bluemle,* 571 F.Supp. 364, at 369 (1983); *Doby,* 642 F.Supp. at 878.

Plaintiffs must only introduce sufficient evidence to create a genuine factual issue concerning the existence of a legitimate justification for the action. *Massarsky,* 706 F.2d at 118. In *Keller v. Bluemle,* 571 F.Supp. at 369, the court delineated the process by which a Plaintiff shows pretext:

In order to avoid summary jugment, Plaintiff must adduce facts raising a genuine issue for trial whether Defendants proffered reasons for his dismissal were pretexts for age discrimination.... Plaintiff may carry his burden directly by adducing evidence such as age-biased statements by his superiors which might

persuade the court that a discriminatory purpose more than likely motivated his employer. *See United States Postal Service Bd. of Governors v. Aikens,* [460] U.S. [711], 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403, quoting *Burdine* 450 U.S. at 256, 101 S.Ct. at 1095. He may carry this burden indirectly by showing that the employer's proffered explanation for his dismissal should not be believed. *Burdine* at 256, 101 S.Ct. at 1095.

Plaintiffs have presented no such direct or circumstantial evidence, nor any other evidence which challenges in any way Defendants' evidence. Rather, Plaintiffs assert that notwithstanding the fact that they were hired as CRC employees and always worked at CRC employees, they should have been given the opportunity to "bump" CMC employees (all of whom were on board prior to the 1981 hiring of Plaintiffs) out of their CMC jobs because Plaintiffs' CRC jobs were eliminated. Plaintiffs' ADEA claims thus merely challenge the Defendants' January 1983 business decision to eliminate the CRC line management positions and to transfer those job duties to CMC.[3] This is clearly insufficient to establish that Defendants' legitimate nondiscriminatory reason was a pretext, or that Defendants had a discriminatory intent in laying off the Plaintiffs. Plaintiffs "may not rest on the allegations of their pleadings or upon bare assertions, conclusory allegations, suspicions or doubts, but must, by affidavit or otherwise set forth *specific facts* showing that there is a genuine issue for trial." *Graham v. F.B. Leopold Co., Inc.,* 602 F.Supp. at 1426 (emphasis in original), *quoting Ness v. Marshall,* 660 F.2d 517, 519 (3d Cir.1981). *See also Nash v. Jacqueline Cochran, Inc.,* 548 F.Supp. 676 at 680 (1982). "[T]here must be some basic evidentiary fact to permit the trier of fact to draw a reasonable inference of intent to discriminate". *Id.*

---

**3.** Plaintiffs' attempt to use the ADEA as a vehicle to review the soundness of legitimate business decisions is clearly inappropriate. *Accord, Kephart v. Institute of Ctas Technology,* 630 F.2d 1217, 1223 (7th Cir.1980) (The ADEA "was not intended as a vehicle for judicial review of business decisions"); *Loeb v. Textron,* 600 F.2d 1003, 1912 n. 6 (1st Cir.1979).

Thus, not only have Plaintiffs proffered a clearly erroneous tri-partite test[4] and hence failed to establish a *prima facie* case of age discrimination, but Defendants have articulated with undisputed evidence a legitimate, non-discriminatory reason for Plaintiffs' discharge. The record is devoid of any evidence from which the trier of fact could reasonably conclude that Plaintiffs were terminated from their line management positions because they were over 40 years of age.

While Plaintiffs are "entitled to every favorable inference," they are not entitled to build a case on the "gossamer threads of whimsey, speculation and conjecture." *Keller v. Bluemle*, 571 F.Supp at 371, *quoting Manganaro v. Delaval Separator Co.*, 309 F.2d 389, 393 (1st Cir.1962). Accordingly, Plaintiffs ADEA claims shall be dismissed.

### B. *ERISA Claim*

 In Count II of their Complaint, Plaintiffs allege that the termination of their employment violated Section 510 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1140. Section 510 provides in pertinent part:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan, his subchapter, or the Welfare and Pension Plans Disclosure Act. (Emphasis added.)

Plaintiffs must therefore plead and prove that the motive for the termination of their employment was to interfere with the attainment of vested pension benefits. *See*, e.g. *Ursic v. Bethlehem Mines*, 556 F.Supp. 571, 575 (W.D.Pa.), *aff'd in pertinent part*, 719 F.2d 670 (3d Cir.1983) ("true purpose" behind discharge of Plaintiff employed by Defendant for more than 29 years was to prevent attainment of impending 30-year service pension). To the contrary, at the time their employment was terminated on January 11, 1983, all of the Plaintiffs were already fully vested participants in the CRC Retirement Income Plan ("Plan"), which had been established concurrently with the formation of CRC. (Evans Affidavit at Para. 3). Thus, Plaintiffs' claims are not within the legislative purpose of Section 510 of ERISA, which was "aimed primarily at preventing unscrupulous employers from discharging or harrassing their employees in order to keep them from obtaining vested pension rights." *West v. Butler*, 621 F.2d 240, 245 (6th Cir.1980).

 More importantly, Plaintiffs cannot point to any evidence which would support a conclusion that the decision to terminate their employment was motivated by any consideration of their pension benefits. The undisputed facts demonstrate that Plaintiffs' employment was terminated when increasing economic losses forced the elimination of Plaintiffs' jobs and the transfer of their duties to existing CMC personnel.

 Plaintiffs "Exhibit 81", ("Ex.A" of the Hirsch Affidavit) which purported to show the savings realized by Defendants from the discontinuance of further contributions to the CRC Pension Plan on behalf of Plaintiffs, is insufficient to establish the requisite intent. It is obvious that an ERISA violation (§ 510) requires more than a showing that the termination of Plaintiffs' employment "meant a monetary savings to Defendants" (Plaintiffs' Mem. at 17), for otherwise an ERISA violation would automatically occur everytime an employer terminated a fully-vested employee (participant), such as Plaintiffs herein, who were covered by a pension plan.

 Even if, *in arguendo*, Plaintiffs could proffer sufficient evidence from which the trier of fact could reasonably find "unlawful motivation" on the part of Defendants, Plaintiffs' failure to exhaust internal administrative remedies under the CRC Pension Plan warrants dismissal of

---

**4.** The tri-partite test proffered by Plaintiffs is unquestionably incorrect in that the fourth *Bur-* *dine* element was missing (See Plaintiffs' Mem. at 5–6).

their ERISA claims.[5] The well-established federal policy, and supporting case law, strongly favors exhaustion of administrative remedies prior to bringing an ERISA-based lawsuit in Federal Court. *See, e.g., DeLisi v. United Parcel Service, Inc.,* 580 F.Supp 1572, 1575 (W.D.Pa.1984) ("A Plaintiff alleging wrongful discharge to prevent attainment of pension rights who fails to exhaust administrative remedies available under the pension plan will find his suit barred."); *Challenger v. Local Union No. 1 of Intern. Bridge,* 619 F.2d 645, 649 (7th Cir.1980) ("[W]e note that Congress intended fund trustees to have primary responsibility for claim processing.... To make every claim dispute into a federal case would undermind the claim procedure contemplated by the Act.") *See also Kross v. Western Elec. Co., Inc.,* 701 F.2d 1238 (7th Cir.1983); *Lucas v. Warner & Swasey Co.,* 475 F.Supp. 1071 (E.D.Pa.1979).

The compelling policy considerations which require an ERISA claimant, in most instances, to exhaust administrative remedies before bringing suit in Federal Court are persuasively set forth in *Amato v. Bernard,* 618 F.2d 559, 567–68 (9th Cir.1980):

"[T]he institution of ... administrative claim-resolution procedures was apparently intended by Congress to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the cost of claims settlement for all concerned. It would certainly be anomalous if the same good reasons that presumably led Congress and the Secretary to require covered plans to provide administrative remedies for aggrieved claimants did not lead the courts to see that those remedies are regularly used. Moreover, the trustees of covered benefit plans are granted broad fiduciary rights and responsibilities under ERISA, sections 401 through 414, 29 U.S.C. §§ 1101–1114, and implementation of the exhaustion requirement

will enhance their ability to expertly and efficiently manage their funds by preventing premature judicial intervention in their decision-making processes. The text of ERISA and the policies underlying that text, far from suggesting that Congress intended to abrogate the exhaustion requirement in the case of suits under ERISA or that sound policy would counsel its abrogation by the courts, suggest just the opposite.

In the instant action, Plaintiffs do not and cannot dispute the fact that they made no effort whatsoever to file an administrative claim with the CRC Pension Plan prior to the institution of the instant suit. Thus, even if Plaintiffs could establish the requisite intent of interferring with their rights to attain pension benefits, as a matter of sound, well-established policy, Plaintiffs ERISA claims would be barred by their failure to exhaust internal remedies under the pension plan.

### C. *Breach of Contract Claim*

In Count III of the Complaint, Plaintiffs allege that the termination of their employment breached an implied agreement for continued employment with CRC "as long as" they performed satisfactorily and the company continued to operate the former Isaly stores. (Complaint, ¶ 42). The general and longstanding rule in Pennsylvania is that a contract for personal service which does not specify a definite period of time for its duration is presumed to be terminable at will. *See Jackson v. Military Publications, Inc.,* 350 F.2d 383, 385 (3d Cir. 1965); *Ferguson v. Freedom Forge Corp.,* 604 F.Supp. 1157, at 1161 (1985); *Henry v. Pittsburgh & Lake Erie Railroad Co.,* 139 Pa. 289, 297, 21 A. 157 (1891). The burden is on the party asserting the contrary to overcome this presumption by showing facts or circumstances demonstrating that the parties intended the employment relationship to endure for a specific tenure. *See, e.g., Ruch v. Strawbridge & Clothier,*

---

**5.** It is undisputed that none of the Plaintiffs, all vested participants in the CRC Pension Plan, filed an administrative claim in accordance with the procedures set forth in the pension plan governing such claims.

*Inc.,* 567 F.Supp. 1078, 1078–79 (E.D.Pa. 1983); *Rogers v. International Business Machines Corp.,* 500 F.Supp. 867, 868–69 (W.D.Pa.1980); *Geib v. Alan Wood Steel Co.,* 419 F.Supp. 1205, 1208 (E.D.Pa.1976); *Green v. Medford Knitwear Mills, Inc.,* 408 F.Supp. 577, 579 (E.D.Pa.1976).

In the instant action, it is undisputed that Plaintiffs had no written contract for employment with CRC. Further, the record is devoid of any evidence that Plaintiffs entered into an oral agreement that their employment with CRC would last for a specific period of time. The *only* evidence that Plaintiffs have proffered to support their claim that an employment contract existed is an October 12, 1981, letter from Edward Johnson, then president of CRC, to all of the formerly Isaly Company employees, including themselves. The letter provides:

October 12, 1981

Ladies and Gentlemen:

I would like to take this opportunity to introduce myself and our company. I am Ed Johnson, President of Custom Restaurant Corporation, a wholly owned subsidiary of Custom Management Corporation. On October 15, Custom will become the new owners of the Isaly Deli and Dairy stores. We are delighted to become part of this fifty-year-old Pittsburgh tradition.

Custom Management Corporation was founded fifteen years ago by President and Chairman, John C. Metz. It is one of the largest and most successful privately held corporations in the country. Custom has been dedicated to the contract management business since its inception and operates more than three hundred different food services and physical plants. From Corporate Headquarters in Kingston, Pennsylvania, Custom operates its food service division as well as Custom Environmental Services, a division dedicated to the contract maintenance field.

Custom Management Corporation has a significant presence in the food service industry—particularly in college food service, health care, and school lunch program. We have enjoyed considerable success in the Pittsburgh area for a number of years and have over one hundred clients and operations within a close proximity to the city. Custom Restaurant Corporation is a newly formed division and marks a determined effort by Custom Management to enter the commercial restaurant field. The Isaly operations are viewed by us as a cornerstone for the future. It is a measure of the significance of our commitment that the Restaurant Division will be headquartered here in Pittsburgh instead of Kingston. Custom Restaurant Corporation also operates several fine dining operations in other parts of Pennsylvania, and we look forward to additional expansion in the Isaly operations as well as other concepts.

We would like to reassure everyone at this time about our commitment to the people who have dedicated their careers to the Isaly organization. Custom Restaurant Corporation has assumed responsibility for the continuation of all benefit programs presently in effect. There will be no change in benefits.

All vacation time, sick pay, etc., that has been earned, accrued or due will be paid. As of October 15, Custom Restaurant Corporation will begin contributions to the established pension plan and union benefit package. We look forward to many prosperous and enjoyable years with you and the organization you have built.

Very truly yours,

CUSTOM RESTAURANT CORPORATION

Signature

Edward T. Johnson

President

Plaintiffs maintain that there is an *implicit* promise contained in the October 12th letter that CRC would continue to employ them for "as long as" they performed satisfactorily and the company continued to operate the Isaly Restaurants. (Complaint, ¶ 142).

Contrary to Plaintiffs' assertion, this Court finds that the October 12th letter does not constitute a contract for permanent employment. The "so long as" inference relied upon by the Plaintiffs does not provide any specific guidelines for determining the duration of the alleged contract and is therefore too ambiguous to overcome the presumption that the employment relationship was terminable at will. *See Geib v. Alan Wood Steel Co.*, 419 F.Supp. 1205, 1207 (E.D.Pa.1976). ("The 'so long as' language cited by the Plaintiff ... is insufficient to overcome the presumption that the contract was terminable at will."). Other courts have similarly rejected claims identical to Plaintiffs.

For example, in *Ferguson v. Freedom Forge Corp., Supra,* the Plaintiff claimed that he had "an implied contract of employment with the Defendant, which allegedly was to last as long as the performance of the Plaintiff's duties was satisfactory." 604 F.Supp. at 1161. In granting summary judgment for the employer, Judge Mencer ruled that Plaintiff did not overcome the presumption of employment at will because he had failed to establish "a contract for any definite term or duration." *Id.*

In *Fleming v. Mack Trucks, Inc.*, 508 F.Supp. 917 (E.D.Pa.1981), Plaintiff submitted an affidavit in which he averred that his employer agreed to employ him "as long as" he performed satisfactorily. Once again, however, the court dismissed the Complaint because this language did not establish the specific tenure necessary to overcome the presumption of employment at will. *Id.* at 920.

■ The fact that Mr. Johnson's letter informed Plaintiffs that CRC had decided to maintain the pension, vacation and other benefits enjoyed by the former Isaly employees also does not give rise to a contract for permanent employment. This contention was clearly addressed in *Moorhouse v. Boeing Co.*, 501 F.Supp. 390, 395 (E.D.Pa. 1980), where Plaintiff testified as follows in support of his claim that his employment relationship was intended to last until retirement age:

"They explained that they would pick up and I would start earning my pension rights from when I was laid off as if I weren't laid off.

They would provide medical insurance for me and life insurance for me and allow me to contribute to my own account in the savings account that Boeing has every—and at that time after 20 years I was getting four weeks' vacation, so I would start getting four weeks' vacation again."

In directing a verdict for Defendant, the Court stated: "It is thus apparent that whatever import was attached to the use of the term permanent, it had nothing to do with the length of Plaintiff's future tenure with the company." *Id.*

The same reasoning used by the Court in *Moorhouse* also applies here. Mr. Johnson's letter simply promised the former Isaly employees that CRC would continue the benefits programs then in effect. But, as the Court in *Moorhouse* held, a contract for a definite period of employment cannot be implied from an employer's decision to continue a benefits program because benefits and tenure are two completely different and unrelated matters.

This Court thus finds that Plaintiffs have failed to provide facts or circumstances demonstrating that the parties intended the employment relationship to endure for a specific tenure. Plaintiffs were therefore employees-at-will of Defendant-employer and could be terminated "with or without cause, at [the] pleasure" of Defendants. *Henry v. Pgh. & Lake Erie R.R.*, 139 Pa. at 297, 21 A. 157.

Further, individual Defendants John C. Metz and Robert Madigan cannot be held liable on this claim. It is a general rule in contract law that no person can be sued for breach of contract unless he is a party to the contract. *Allen Organ Co. v. North American Rockwell Corp.*, 363 F.Supp. 1117, 1139 (E.D.Pa.1973). It is also fundamental that a corporate officer cannot be held liable on a contract between the corporation and a third-party unless the corporate officer assumes a personal obligation

in the contract itself. *Leslie v. Philadelphia 1976 Bicentennial Corp.*, 332 F.Supp. 83, 93 (E.D.Pa.1971) (claim for breach of employment contract dismissed as to corporate officers.)

There is no evidence in the record that the individual Defendants were parties to the alleged contract of employment or that they assumed a personal obligation in the alleged contract itself. Plaintiffs' breach of contract claim shall therefore be DISMISSED, as to all Defendants.

Accordingly, Defendants' Motion for Summary Judgment shall be GRANTED.